# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

David A. P.,                                           Case No. 20-cv-1586 (TNL)

       Plaintiff,

v.                                                            **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security, [1]

       Defendant.

---

Fay E. Fishman, Peterson & Fishman, 2915 South Wayzata Boulevard, Minneapolis, MN 55405 (for Plaintiff); and

Michael Moss and Tracey Wirmani, Special Assistant United States Attorneys, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff David A. P. brings the present case, contesting Defendant Commissioner of Social Security's denial of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.*  The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul.  A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross motions for summary judgment. ECF Nos. 16, 19.  Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 16, is **DENIED** and the Commissioner's Motion for Summary Judgment, ECF No. 19, is **GRANTED**.

## II. PROCEDURAL HISTORY

On August 3, 2017, Plaintiff applied for DIB and SSI asserting that he has been disabled since April 2017 due to back and neck pain, a cognitive disorder, depression, attention deficit hyperactivity disorder ("ADHD"), and seizures.  Tr. 13, 257-69.  Plaintiff's applications were denied initially and again upon reconsideration.  Tr. 180-84, 191-96.

Plaintiff appealed the reconsideration of his DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  Tr. 197-98.  The ALJ held a hearing in July 2019, and issued an unfavorable decision.  Tr. 10-78.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-6.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 16, 19. This matter is now fully briefed and ready for a determination on the papers.

### III. MEDICAL RECORDS

Plaintiff has a history of neurocognitive disorder, ADHD, and neck and back pain. *See, e.g.*, Tr. 399, 412, 423, 505, 510, 596.  Among other medications, Plaintiff has been prescribed Keppra[2] and naproxen.[3]  *See, e.g.*, Tr. 419-20, 424, 545-46.

### A. Mental Impairments

#### 1. 2013

In late October 2013, Plaintiff was seen by psychologist Curtis Siegel for a psychotherapy intake session after bringing up concerns with his ability to concentrate.  Tr. 391, 397.  Plaintiff reported that he started a welding program at North Hennepin Technical College.  Tr. 391.  While he was passing his tests, he believed that was only because they were open book, online exams.  Tr. 391.  Plaintiff reported that as a child, he had a seizure disorder, right-hand tremor, mild hydrocephalus, and learning disabilities.  Tr. 391.  He described difficulties doing homework, paying attention, and having his mind wander.  Tr. 391.  He was directed to complete the "Semistructured Interview for Adult ADHD" and return for therapy with Siegel.  Tr. 393.

Plaintiff was seen by Siegel in November and December for ADHD therapy.  Tr. 395-401.  Based on Plaintiff's history of being diagnosed with ADHD as a child, reported difficulties with distractibility and having trouble focusing, current problems in his college program, and his responses in the Semistructured Interview for Adult ADHD which

---

[2] Keppra is a brand name for levetiracetam, a medication used to control and treat seizures "by decreasing abnormal excitement in the brain." *Levetiracetam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a699059 html (last accessed Mar. 23, 2022).

[3] Naproxen is a medication "used to relieve pain, tenderness, swelling, and stiffness." *Naproxen*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a681029.html (last accessed Mar. 23, 2022).

highlighted problems with inattentiveness, Siegel concluded that Plaintiff met the criteria for ADHD, predominantly inattentive type.  Tr. 399.  Plaintiff was not interested with continuing therapy.  Tr. 399.  He was directed to schedule a psychiatry intake and stop drinking alcohol.  Tr. 401.  Siegel told Plaintiff it would be highly unlikely that a physician would prescribe him ADHD medication given that he reported having 2-4 pints of alcohol per week, though not every week.  Tr. 401.

### 2.  2014

In February 2014, Plaintiff was seen by Richard Peterson, M.D.  Tr. 402.  Dr. Peterson reviewed Plaintiff's childhood records from the University of Minnesota pediatric neurology unit in the 1970s, which showed a history of hydrocephalus, an abnormal electroencephalograph ("EEG") that revealed bifrontal spikes, and that Plaintiff had been prescribed Dilantin.[4]  Tr. 402.  Plaintiff required special education and had special classes for learning development throughout high school.  Tr. 402.  Dr. Peterson noted that "[i]t is very possible that" Plaintiff's memory problems and difficulty learning new information "simply is an extension of what he has dealt with throughout his life."  Tr. 403.  But given Plaintiff's reports about feeling like his memory is getting worse overtime and the prior abnormal EEG, Dr. Peterson recommended that Plaintiff obtain an EEG for further evaluation.  Tr. 403.

Plaintiff then completed a head MRI and EEG.  Tr. 447, 448.  The EEG was deemed to be abnormal "because of the bursts of generalized (left temporal predominant)

---

[4] Dilantin is a brand name for phenytoin injections, a medication used to treat seizures.  *Phenytoin Injection*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a619062 html (last accessed Mar. 23, 2022).

polymorphic sharp as well as slow activity and multifocal sharp waves and spikes."  Tr. 449.  Given that the EEG showed epileptiform discharges concerning for seizure potential, Dr. Peterson started Plaintiff on Keppra, a medication that treats seizures, at a dose of 500 mg.  Tr. 419-20.

Plaintiff was again seen by Dr. Peterson in April.  Tr. 419.  Dr. Peterson observed that Plaintiff was tolerating his current dose of Keppra well and had no significant side effects, but Plaintiff reported that he had not noticed a change in memory overall.  Tr. 419.  Dr. Peterson increased Plaintiff's dose to 1000 mg and referred Plaintiff for formal neuropsychological testing.  Tr. 420.  Dr. Peterson noted that he "think[s] the real issue here is whether or not what [Plaintiff] is experiencing is an extension of his lifelong memory and learning difficulties, or if there are other contributing factors.  [Plaintiff] did have a significant history of alcohol intake which . . . can also have a significant impact on memory and cognition."  Tr. 420.

Plaintiff then completed his neuropsychological testing with neuropsychologist Terry Barclay in late April.  Tr. 422.  Barclay concluded that the "[r]esults of [the] neuropsychological evaluation [we]re mildly to moderately abnormal."  Tr. 449.  Plaintiff presented with "long-standing developmental delays, learning disabilities, and attention deficit disorder."  Tr. 449.  "Current test results provide evidence of moderate dysfunction in attention and executive control as well as mild psychomotor slowing."  Tr. 449.  Barclay found that Plaintiff's "most prominent impairment is erratic attention and concentration functions."  Tr. 449.  Test results also "support mild to moderate deficits in learning" and variably poor memory functions driven primarily by lack of attention and executive

5

dysfunction.  Tr. 449.  Barclay recommended that Plaintiff get 7 to 8 hours of sleep at night, increase physical activity, try compensatory strategies like reminding himself to slow down, and complete home-based cognitive training using programs like www.lumosity.com or www.brainhq.com.  Tr. 450.  Barclay also recommended that Plaintiff complete vocational rehabilitation at the Courage Center or other local facility to help him to select an appropriate job type and give him practical tools to improve his efficiency and competency at work.  Tr. 450.   During the testing with Barclay, Plaintiff reported that he was currently employed as a delivery person for Domino's Pizza.  Tr. 452. When he started the job in August 2013, he was working three days a week, but his hours were cut to one day a week following new management.  Tr. 452.  Plaintiff reported that he had asked for more work but was not getting additional hours and was looking for other jobs.  Tr. 452.

In May, Plaintiff returned to Dr. Peterson to follow up after his neuropsychological testing with Barclay.  Tr. 431.  Dr. Peterson reported that Plaintiff "has not had any obvious seizures, is tolerating Keppra well without any significant side effects," and "has no new or different symptoms to report."  Tr. 431.  Dr. Peterson noted that "[t]here is no surprise here that findings are consistent with his long-standing developmental delay and learning disabilities."  Tr. 432.  Dr. Peterson also noted that "[i]t is common in these situations that as patients age, they do notice more problems over time" and that it was "likely not realistic that [Plaintiff] will be able to continue with college-level classes as he has not been able to keep up with this coursework."  Tr. 432.  Dr. Peterson discussed vocational rehabilitation with Plaintiff, which he described could help Plaintiff "evaluate and give him the best

6

chance of finding an appropriate job." Tr. 432. Plaintiff was continued on Keppra based on his history and EEG that showed a clear predisposition for seizures with epileptiform discharges. Tr. 432. Plaintiff was directed to return in six months for routine follow-up visit. Tr. 432.

### 3. 2016

Plaintiff returned to see Dr. Peterson in August 2016. Tr. 501. Dr. Peterson noted that Plaintiff tried vocational rehabilitation after his neuropsychometric testing without clear benefit. Tr. 501. Dr. Peterson opined that he "think[s] it would be difficult for [Plaintiff] to maintain gainful employment." Tr. 501. Dr. Peterson reported that since he last saw him, Plaintiff "has been stable overall, no clear seizures." Tr. 501. Plaintiff was no longer taking Keppra, is "still forgetful off medication, feels this is about the same, has problems with his short term memory," and has no new headaches, visual changes, unexplained episodes of loss of consciousness, weakness, or numbness. Tr. 501. Plaintiff was prescribed Aricept[5] at a 5 mg dose for memory. Tr. 501-02. Plaintiff was instructed to return for a follow-up appointment in three months. Tr. 501-02.

Plaintiff next saw Dr. Peterson in December and he observed that Plaintiff had been stable overall with no clear seizures since he last saw him. Tr. 508. Plaintiff reported that he had not noticed any significant change with Aricept, but had no new headaches, visual changes, unexplained episodes of loss of consciousness, weakness, or numbness. Tr. 508. Plaintiff reported that he lost his most recent job and was deciding whether to look for

---

[5] Aricept is a brand name for donepezil, a medication used to treat dementia. *Donepezil*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697032.html (last accessed Mar. 23, 2022).

another job.  Tr. 508.  Dr. Peterson continued Plaintiff on Aricept, but increased the dose to 10 mg, and instructed Plaintiff to follow up in six months.  Tr. 508-09.

### 4.  2017

In January 2017, Plaintiff was seen by Vivian Fink, M.D. for a second opinion on his memory concerns.  Tr. 510.  Dr. Fink noted that Plaintiff "did not want to discuss any particular concern with [her]," but instead asked her "how [she] practiced auscultations." Tr. 510.  He asked her if she believed nonwestern medicine is appropriate and if she would prescribe medical marijuana.  Tr. 510.  Dr. Fink told Plaintiff that the referral was done to get a second opinion on memory concerns, and she briefly discussed the previous neuropsychological testing that diagnosed him with ADHD.  Tr. 510.  Dr. Fink noted that Plaintiff "got frustrated when [she] explained to him [she] needed to have a main concern to address if he did not feel memory was his main concern."  Tr. 511.  She noted that Plaintiff "answered the only thing he needed was 'to know how [Dr. Fink] practiced and if [she] would prescribe[ ] medical marijuana."  Tr. 511.  Plaintiff then "left the room not interested in a full interview or neurological exam."  Tr. 511.

In July, Plaintiff was seen by Julia Johnson, M.D. for an additional opinion on his memory concerns.  Tr. 515.  Plaintiff reported that he had been having "staring episodes" and continued problems with his memory and asked if there are "signs" to tell when he may have a seizure or not.  Tr. 516.  Plaintiff additionally reported that he was not sure if Aricept was helping him at all.  Tr. 516.  Dr. Johnson decided to refer Plaintiff for a video EEG ("V-EEG") before restarting a seizure medication, noting it was "[u]nclear if his spells are even seizures."  Tr. 518.  Dr. Johnson took Plaintiff off Aricept, noting that it

8

treats dementia and she did not believe that Plaintiff needed it.  Tr. 518.  Plaintiff requested repeat neuropsychological testing, which Dr. Johnson ordered for him.  Tr. 518.  Dr. Johnson also referred Plaintiff to occupational therapy for a driving evaluation because Plaintiff noted concern about his ability to drive.[6]  Tr. 518.  Plaintiff was directed to follow up in six months.  Tr. 518.

Plaintiff then completed the V-EEG that was ordered by Dr. Johnson.  Tr. 545.  Dr. Johnson referred Plaintiff to Dr. Priyanka Sabharwal, who Plaintiff saw in August 2017.  Tr. 542, 545.  Dr. Sabharwal explained that the V-EEG was abnormal and revealed "independent bilateral frontotemporal excitability."  Tr 542.  Dr. Sabharwal noted that Plaintiff's "[e]pisodes of 'zoning out' could be either focal seizures (given history of epilepsy and bilateral frontotemporal cortical hyperexcitability seen on [the] recent EEG)" or "behavioral spells."  Tr. 545.  Dr. Sabharwal ordered an extended ambulatory EEG to try to capture and characterize the "zoning out" spells.  Tr. 545.  Dr. Sabharwal put Plaintiff back on Keppra.  Tr. 545-46.  She also referred Plaintiff for a repeat neuropsychological evaluation, as Plaintiff discussed previously with Dr. Johnson.  Tr. 546.

In late August, Plaintiff completed a 24-hour ambulatory EEG test.  Tr. 573.  At one point during the test, Plaintiff reported that "he 'felt funny' and had 'rapid eye movements,'" but the test revealed "no epileptiform abnormalities."  Tr. 574.  Dr. Melissa

---

[6] At his request, in July 2017, Plaintiff saw occupational therapist Angela Kezar at the "Driving Room NSC."  Tr. 521.  According to Kezar, Plaintiff demonstrated physical, visual, and cognitive skills adequate for safe operation of a motor vehicle so long as he remains undistracted.  Tr. 521.  Kezar reported that Plaintiff benefited from the education she provided on reducing distractions such as music, phone, and being in unfamiliar areas.  Tr. 521.

Samuelsson reported that "[t]his is a normal 24[-]hour ambulatory EEG.  There were some sharply contoured wave forms during drowsiness but were not epileptiform."  Tr. 574.

In late September, Plaintiff was seen by psychologist John O'Regan for a psychological evaluation at the Minnesota Disability Determination Services.  Tr. 555. O'Regan listed Plaintiff's diagnoses as ADHD and major depressive disorder.  Tr. 560. O'Regan observed symptoms of hyperactivity, including fidgetiness, and difficulty being quiet and talking excessively.  Tr. 556.

In November, Plaintiff was seen by Barclay for a second neuropsychological exam. Tr. 706-07.  Barclay concluded that when comparing the first neuropsychological test results from April 2014 to the new test results, "there is no evidence whatsoever of any worsening of [Plaintiff's] neurocognitive status."  Tr. 707-08.  Barclay noted that Plaintiff's "[s]pontaneous recall functions are possibly slightly/minimally improved versus stable compared to his last exam," and "[a]ll other neurocognitive domains have remained static over this time period as well."  Tr. 708.  "Everyday functional skills are also broadly unchanged since the time of his last evaluation."  Tr. 708.  Like the results in 2014, the "[r]esults of [the] neuropsychological evaluation [we]re mildly to moderately abnormal." Tr. 707.  Barclay recommended that Plaintiff strengthen his sleep practices, improve nutrition, and increase physical activity.  Tr. 708-09.  Barclay noted that Plaintiff's mild to moderate cognitive deficits would be expected to interfere with his ability to sustain competitive employment in most scenarios.  Tr. 709.  He would need a fair amount of repetition and hands-on experience in order to learn and encode new processes or procedures, though there could still be a high risk of error.  Tr. 709.

### 5.  2018

Plaintiff saw a nurse practitioner in early January 2018 to receive the results of his neuropsychological test with Barclay.  Tr. 624, 708.  The treatment provider noted that "[t]here was no significant change in his cognition compared to 2014, with the exception of a slight improvement in memory."  Tr. 625.  Per Barclay's findings, the treatment provider recommended that Plaintiff improve nutrition and sleep and increase physical activity.  Tr. 625.  Plaintiff was continued on Keppra and instructed to return for a follow-up visit in three months.  Tr. 632.

Plaintiff returned for his routine follow-up visit with Dr. Sabharwal in early April. Tr. 636.  Plaintiff reported being unaware if he was still having episodes of "zoning out," but believed his last episode was a few months ago.  Tr. 636.  He reported having trouble with balance, sinus issues, back pain, and numbness in feet.  Tr. 636.  Dr. Sabharwal noted that Plaintiff's memory was "stable."  Tr. 636.  Dr. Sabharwal ordered blood work to rule out reversible causes of neuropathy and a repeat 48-hour EEG study to be scheduled in the fall.  Tr. 640.  Plaintiff was continued on Keppra and instructed to follow up in six months. Tr. 640.

Plaintiff completed the repeat ambulatory EEG in September.  Tr. 727.  The results were "consistent with a normal electrographic background."  Tr. 729.  Dr. Sabharwal informed Plaintiff "that results of [the] EEG look normal."  Tr. 676-78.

Plaintiff was seen by Dr. Sabharwal in early October after his ambulatory EEG.  Tr. 680.  Dr. Sabharwal continued Plaintiff on Keppra and recommended that he see a

behavioral health specialist to aid with ADHD management.  Tr. 683.  Dr. Sabharwal noted that Plaintiff's memory was "stable."  Tr. 680.

Plaintiff began attending individual therapy with psychologist Edna Geddes at Nystrom & Associates in late 2018.  Tr. 778.  He reported that therapy was recommended by his neurologist (Dr. Sabharwal), though he was not "really sure [ ] why therapy was recommended" as Dr. Sabharwal said that Plaintiff "seem[ed] to be doing just fine."  Tr. 778.  Plaintiff reported "poor concentration, insomnia, irritability, memory difficulties and situational depression."   Tr. 779.   Plaintiff discussed feeling excessive worry, irritability/agitation, difficulty concentrating, shortness of breath, and nervousness.  Tr. 779.  He reported that he occasionally uses caffeine, drinks alcohol three times per week, and occasionally uses cannabis, but does not use other substances.  Tr. 780.  Geddes concluded that Plaintiff met the criteria for generalized anxiety disorder and attention deficit disorder ("ADD") without hyperactivity.  Tr. 778, 781.  Geddes noted that Plaintiff would benefit from medication management and individual therapy.  Tr. 780.

Plaintiff continued seeing Geddes for individual therapy every few weeks through the end of 2018.  Tr. 773-82.  Geddes generally reported that Plaintiff's mood was "[a]nxious" throughout these sessions.  Tr. 773-75, 782.  At points, Geddes reported that Plaintiff was "well groomed."  *See, e.g.*, Tr. 780.  At other points, Geddes reported that Plaintiff was "unkept, clothing dirty, slight odor."  *See, e.g.*, Tr. 782.

### 6.  2019

Plaintiff continued attending individual therapy with Geddes every week or two throughout 2019.  Tr. 748-72.  Geddes routinely described Plaintiff's mood as anxious.

*See generally* Tr. 748-72.   Several sessions focused on dealing with Plaintiff's mother's declining health and, later, death.   *See, e.g.*, Tr. 749-50, 752-63, 765-67.

Plaintiff also saw Dr. Sabharwal in April.   Tr. 690.   At the time, he reported that his mother was having health issues.   Tr. 690.   He was unaware if he was still having episodes of "zoning out" but reported continued memory issues and bilateral hand tremors.   Tr. 690. Dr. Sabharwal again noted that Plaintiff's memory was "stable."   Tr. 690.   Plaintiff was continued on Keppra and instructed to continue meeting with a behavioral therapist to aid in ADHD management.   Tr. 693.

### B.  Physical Impairments

#### 1.  2014

In late March 2014, Plaintiff was seen at an urgent care for pain in his right lower back that he had been experiencing for two days.   Tr. 412.   He was given instructions for exercises to do and advised to take ibuprofen for pain and apply ice and heat as needed. Tr. 412.

In May, Plaintiff was seen by Keith Spears, M.D. for lower back pain.   Tr. 423. Plaintiff explained that he had been experiencing pain for one month, and the pain was a severity nine out of ten.   Tr. 423.   Dr. Spears prescribed naproxen and cyclobenzaprine[7] and referred Plaintiff to physical therapy.   Tr. 424.   Plaintiff was later seen by Michael Goertz, M.D. at a spine clinic for an evaluation of neck and back pain.   Tr. 434, 439.   He reported having problems since at least the mid-1990's but said that it had "been bothering

---

[7] Cyclobenzaprine is a medication "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."   *Cyclobenzaprine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682514.html (last accessed Mar. 23, 2022).

him more lately." Tr. 439.  He explained that he was currently working as a delivery driver but it had become progressively more difficult for him and he was not sure if he could continue working.  Tr. 439.  Dr. Goertz noted that Plaintiff had been treated conservatively for his neck and lower back pain in the past.  Tr. 439.  Dr. Goertz wanted to wait until he received records from other clinics that Plaintiff had been treated at, but limited further evaluation to an electromyography ("EMG") of the left arm and right leg.  Tr. 441.  If those were negative, Dr. Goertz recommended an aggressive strengthening program and noted that he did not feel that imaging was necessary.  Tr. 441.

In early June, Plaintiff was seen by Richard Timming, M.D. for an EMG.  Tr. 443, 457.  The results of that examination were deemed normal.  Tr. 462.  Specifically, Dr. Timming found "no electrodiagnostic evidence of focal neuropathy in the right lower extremity or left upper extremity" and "no electrodiagnostic evidence of right lumbar sacral or left cervical radiculopathy."  Tr. 462.

### 2.  2016

Plaintiff was seen by chiropractor Barry Taylor several times in 2016 for treatment for back and neck pain.  Tr. 474, 477, 479, 480, 482-83.  Taylor noted that Plaintiff presented with low back pain that had been bothersome for approximately three months. Tr. 483.  The pain was not constant but occurred frequently throughout the day when bending forward at the waist.  Tr. 483.  Plaintiff was treated with instrument-assisted manipulation of cervical thoracic joint fixations to improve joint function and range of motion.  Tr. 475, 477, 479.  Plaintiff was also treated with manual manipulation to improve

14

function and range of motion and a soft-tissue massage.  Tr. 479, 481, 483.  Plaintiff was provided home exercises to treat pain.  Tr. 483-84.

In late August, Plaintiff was seen by Nicholas Anderson, M.D. for lower back pain that he reported to be a ten out of ten.  Tr. 496.  Plaintiff's pain would come and go and was always related to his position.  Tr. 496.  If he was sitting still, he did not have any pain.  Tr. 496.  But a small twist or motion could incite pain.  Tr. 496.  Plaintiff reported his mobility was still very good.  Tr. 496.  Dr. Anderson observed that Plaintiff was pleasant, well-developed, well-nourished, in no distress, and his neurological status was alert and oriented.  Tr. 496.  Plaintiff asked about the potential of using marijuana for pain control.  Tr. 496.  Dr. Anderson was not sure that he would qualify for the definition of chronic pain given that his pain was "intermittent."  Tr. 496.  Dr. Anderson prescribed Plaintiff meloxicam[8] and recommended physical therapy.  Tr. 496.

In November, Plaintiff saw Dr. Anderson again, this time for neck pain.  Tr. 504.  He reported that his back pain had resolved, but he was still having neck pain that he believed was related to a motor vehicle accident in early February 2016.  Tr. 504.  Plaintiff reported that the pain came in short, jolt-like episodes that would last for a few seconds and then disappear.  Tr. 504.  He also reported that certain activities, particularly, heavy lifting at work, may exacerbate his neck pain.  Tr. 504.  Dr. Anderson noted that Plaintiff had been "treated conservatively" for neck pain in the past, has undergone physical therapy, and tried acupuncture.  Tr. 504.  Dr. Anderson wrote that Plaintiff "is not here for treatment,

---

[8] Meloxicam is a medication "used to relieve pain, tenderness, swelling, and stiffness."  *Meloxicam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601242.html (last accessed Mar. 23, 2022).

more for [Dr. Anderson] to complete some documentation related to a legal claim."  Tr. 505.  Dr. Anderson recommended Plaintiff take anti-inflammatory medication as needed and continue stretching exercises.  Tr. 505.  Dr. Anderson also offered Plaintiff a referral to physician's neck and back, which he declined.  Tr. 505.

### 3.  2017

Plaintiff saw Dr. Anderson in November 2017 for midline low back pain and right low back pain as well as bilateral lower extremity weakness.  Tr. 615.  Plaintiff reported that his back pain had previously been partially alleviated one year ago following physical therapy, but he admitted that he stopped the stretching exercises and had not been keeping up.  Tr. 615.  Dr. Anderson recommended more regular use of anti-inflammatories for long-term pain control as well as core strengthening.  Tr. 616.

Plaintiff was seen by Dr. Carlton Kimmerle for an evaluation of his back and neck pain in December.  Tr. 620.  Dr. Kimmerle did an x-ray of Plaintiff's cervical spine and recommended that Plaintiff begin physical therapy and get regular exercise and activity.  Tr. 622.

### 4.  2018

Plaintiff saw Dr. Kimmerle throughout 2018 for neck and back pain.  Tr. 642, 649, 654, 659, 668, 684.  He was referred to physical therapy and regularly received joint steroid injections.  Tr. 644, 662, 668.  Plaintiff reported some continued improvement in pain.  Tr. 649, 668, 684.  Plaintiff also began using a transcutaneous electrical nerve stimulation ("TENS") unit and reported good relief of pain.  Tr. 671-72, 684.

### 5.  2019

Plaintiff saw Dr. Anderson for routine health maintenance in 2019.  Tr. 688.  In January, Dr. Anderson noted that Plaintiff "does not function at a high level because of multifactorial problems[,] cognitive impairment, developmental delay, memory problems and possibly a seizure disorder."  Tr. 689.  Given a significant family history of cardiac disease, Dr. Anderson recommended that Plaintiff start taking aspirin at age 50.  Tr. 689. In May, Dr. Anderson discussed paperwork related to Plaintiff's Social Security disability application.  Tr. 694.  Plaintiff reported that he smokes street marijuana regularly but "wants to become certified for medical cannabis."  Tr. 694.  He reported that his memory may slowly be getting worse.  Tr. 694.  Dr. Anderson noted that, as far as Plaintiff's memory deficits, he "appears stable based on interactions and questioning and responses today."  Tr. 694.  Dr. Anderson also noted that Plaintiff's symptoms are stable.  Tr. 694. Plaintiff also saw Dr. Anderson in June to discuss lower back pain and for Dr. Anderson to fill out disability-related forms.  Tr. 695.  Dr. Anderson discussed with Plaintiff continued use of anti-inflammatories and stretching exercises and activities to help alleviate his chronic neck and low back pain.  Tr. 695.

## IV. OPINION EVIDENCE

### A.  Mental Impairments

#### 1.  State Agency Psychological Consultants

The state agency psychological consultants assessed Plaintiff's mental residual functional capacity.  Tr. 111-15, 150-152.  They opined that Plaintiff had no understanding and memory limitations or adaptation limitations.  Tr. 112, 150-51.  They opined that he

did have sustained concentration and persistence limitations.  Tr. 112, 150.  Specifically, Plaintiff was deemed moderately limited at "maintain[ing] attention and concentration for extended periods" and "perform[ing] at a consistent pace without an unreasonable number and length of rest periods."  Tr. 112, 150-51.  Plaintiff, however, was not significantly limited in his abilities to carry out short, simple, or detailed instructions, maintain regular attendance, make simple work-related decisions, and work in coordination with others without being distracted by them.  Tr. 112, 150-51.

The state agency psychological consultants noted that "[t]he evidence suggests that [Plaintiff] can understand, remember, and carry out semiskilled tasks" and "relate on at least a superficial basis and on an ongoing basis with co-workers and supervisors."  Tr. 112, 151.  They concluded that Plaintiff "can attend to tasks for a sufficient period of time to complete tasks" and "can manage the stresses involved with semiskilled work."  Tr. 112, 151.

One of the state agency psychological consultants considered Dr. Johnson's October 2017 medical opinion form where she opined that Plaintiff was "[u]nable to perform any employment" and "will not be able to perform any employment in the foreseeable future."  Tr. 152, 585.  The state agency psychological consultant found that Dr. Johnson's "medical opinion is without substantial support from the medical source who made it" which therefore rendered it less persuasive.  Tr. 152.

### 2. O'Regan

O'Regan opined on Plaintiff's ability to perform certain work-related activity. O'Regan opined that Plaintiff "would be able to tolerate the stress and pressure typically

found in an entry level workplace." Tr. 561. He noted that "[b]ased on [Plaintiff's] current social and emotional functioning, he has the mental capacity to understand, remember, and follow simple and complex instructions." Tr. 560. Plaintiff's "capacity to sustain attention and concentration is moderately impaired as a result of his medical condition," but "he should be able to carry out work-like tasks with reasonable pace and persistence." Tr. 560-61. Further, O'Regan opined that Plaintiff "would also have no difficulty responding appropriately to brief and superficial contacts with coworkers, supervisors, and the public." Tr. 561.

### 3. Johnson

In late October 2017, Dr. Johnson filled out a medical opinion form. Tr. 581-85. Dr. Johnson noted that Plaintiff was diagnosed with a learning disability, seizures, and memory concerns, and had cognitive dysfunction. Tr. 585. Dr. Johnson reported that these conditions will be lifelong and wrote that Plaintiff is "[u]nable to perform any employment" and "will not be able to perform any employment in the foreseeable future." Tr. 585.

### 4. Barclay

In early January 2018, Barclay completed a mental medical source statement. Tr. 596-98. Barclay noted that she had seen Plaintiff for two neuropsychological exams between April 2014 and November 2017 and that Plaintiff has mild neurocognitive disorder, a learning disability, and depression. Tr. 596. Barclay opined that Plaintiff had a fair ability to do several work-related tasks, including, but not limited to: understand, remember, and carry out short and simple instructions, make judgments on simple work-

related decisions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, get along with co-workers and peers, interact appropriately with the public, and adhere to basic standards of neatness and cleanliness.  Tr. 596-97.  She opined that Plaintiff had poor ability to: understand and remember detailed instructions, maintain attention and concentration for extended periods, work with or near others without being distracted by them, complete a normal workday or workweek, and perform at a consistent pace.  Tr. 596-97.  Lastly, she opined that Plaintiff had good ability to: ask simple questions or request assistance.  Tr. 597.  Barclay believed that Plaintiff would be "off task" 25% or more of the time and would be absent from work about four days per month due to his impairments or treatment.  Tr. 597-98.

### 5. Sabharwal

In May 2019, Dr. Sabharwal filled out a mental medical assessment of ability to do work-related activities.  Tr. 603-06.  Dr. Sabharwal opined that Plaintiff had fair ability to: follow work rules, use judgment, function independently, maintain personal appearance, and understand, remember, and carry out simple and complex job instructions.  Tr. 604-05.  She opined that Plaintiff had poor or no ability to: relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention/concentration, and understand, remember, and carry out detailed, but not complex job instructions.  Tr. 603-04.  She anticipated that Plaintiff would be absent from work about once a month due to his impairments or treatment.  Tr. 606.

### B. Physical Impairments

#### 1. State Agency Medical Consultants

The state agency medical consultants assessed Plaintiff's physical residual functional capacity.  Tr. 109-11, 113-15, 148-54.  They opined that Plaintiff had exertional limitations.  Tr. 109, 148.  Specifically, Plaintiff was limited to occasionally lifting/carrying 50 pounds and frequently lifting/carrying 25 pounds.  Tr. 109-10, 148.  Additionally, Plaintiff could only sit, stand, or walk for about 6 hours in an 8-hour workday.  Tr. 110, 148.  They also opined that Plaintiff had postural limitations including frequently climbing ramps/stairs, stooping, and crouching.  Tr 110, 148.  He should specifically avoid climbing ladders and unprotected heights secondary to his seizure disorder.  Tr. 110, 149.  The state agency medical consultants opined that Plaintiff did not have manipulative, visual, or communicative limitations.  Tr. 110, 149.

One of the state agency medical consultants, Dr. Gregory Salmi, noted that Plaintiff's "[b]ack complaints appear to be mostly brief sharp pains, although he states he is in constant pain."  Tr. 149.  He also reported that Plaintiff's "alleged limitations are greater than would be expected from and are only partially consistent with the objective evidence."  Tr. 149.  The state agency medical consultants opined that Plaintiff could perform medium work.  Tr. 114, 153.

#### 2. Johnson

In late October 2017, Dr. Johnson, Plaintiff's neurologist, completed a physical medical source statement.  Tr. 581-84.  Dr. Johnson noted that Plaintiff's diagnoses were learning disabilities and seizures and his symptoms were memory concerns, developmental

delays, and learning disabilities.  Tr. 581.  Dr. Johnson did not answer any of the questions related to Plaintiff's physical impairments.  *See* Tr. 581-84.  Instead, Dr. Johnson handwrote on the side of the form that Plaintiff "has cognitive deficits that may reduce [h]is abili[ty] to wor[k]."  Tr. 582.

### 3. Anderson

Dr. Anderson completed a physical medical source statement in November 2017. Tr. 592-95.  He noted that Plaintiff was experiencing sharp pains in his neck and back and that physical therapy and pain medications were not effective.  Tr. 592.  Pain was alleviated by rest only. Tr. 592.  Dr. Anderson reported that Plaintiff could sit for one hour at a time and stand for ten minutes at a time if placed in a competitive work environment.  Tr. 593. In an eight-hour workday with normal breaks, Dr. Anderson reported that Plaintiff could sit for about four hours and stand/walk for less than two hours.  Tr. 593.  He opined that Plaintiff needed a job that permits shifting positions at will from sitting, standing, or walking.  Tr. 593.  According to Dr. Anderson, Plaintiff also needed to walk for one minute every thirty minutes and take a five-minute rest/unscheduled break twice a day.  Tr. 593. He opined that Plaintiff would be off task 25% or more of the time due to his symptoms. Tr. 595.  Dr. Anderson noted that due to memory deficits and cognition limitations, Plaintiff "would not be suitable to work in hazardous environments."  Tr. 595.

In June 2019, Dr. Anderson completed a physical residual functional capacity questionnaire.  Tr. 608-13, 695.  Dr. Anderson noted that Plaintiff was diagnosed with low back pain and neck pain and that his prognosis was fair.  Tr. 608.  He opined that Plaintiff's pain or other symptoms would interfere with his attention and concentration up to 50% of

22

the day.  Tr. 609.  In terms of his ability to tolerate work stress, Dr. Anderson opined that Plaintiff was "[c]apable of low stress jobs."  Tr. 610.  He reported that Plaintiff can continuously sit for 30 minutes at a time and stand for 20 minutes at a time, and that he could sit, stand, and walk for about four hours in a working day with normal breaks.  Tr. 610.  Plaintiff needs a job which permits shifting positions from sitting, standing, or walking, and will need to take an unscheduled break every one or two hours.  Tr. 611.  Dr. Anderson estimated that Plaintiff would be absent from work due to his impairments or treatment about three times a month.  Tr. 613.

## V. HEARING TESTIMONY

At the hearing, Plaintiff testified that he has back and neck problems.  Tr. 57.  He testified that if he sits too long or walks too far, his back and neck start bothering him.  Tr. 57.  He reported that he can walk about a block, sit comfortably for ten minutes, and stand for anywhere between five and fifteen minutes.  Tr. 57-58.  He testified that his back and neck often do not bother him when sitting or laying down, but the pain can quickly "kick in" at any point.  Tr. 57-58.  Plaintiff also testified that he sometimes gets tingling from his neck into his fingers.  Tr. 58.  He testified that if he were moving his hands more at work, his neck would flare up and he would get a tingling sensation.  Tr. 58.

Plaintiff also testified about his mental impairments.  He testified that he has problems with concentration and attention, but those have at least somewhat improved with medication, no longer needing to take care of his mother, and not going to school or working or having other stresses.  Tr. 59-60.  He reported that he still has problems with

multi-tasking and anxiety.  Tr. 60-61.  He testified that he did not drive to the hearing because of his anxiety, though he reported that he does still drive.  Tr. 61.

Plaintiff reported that he went to community college for a semester or two for welding.  Tr. 65.  He testified that he stopped going to school because he was having problems paying attention in the classroom and studying out of the classroom.  Tr. 67.  He said he had a hard time "remember[ing] things from the books" and did not pass or could not successfully complete certain welds that were required to continue with the program. Tr. 67.

Plaintiff also discussed his work history.  Plaintiff testified that his last job was at National Coating Supply where he worked part-time (about 20 hours per week, sometimes more or less) for about two years. Tr. 43, 47.  Plaintiff's responsibilities included collecting items from a warehouse, loading them into a truck, and delivering them.  Tr. 46-47.  He reported that he would often mix up the products and deliver the wrong ones.  Tr. 44, 47. He also reported that it took him much longer to do the job than others.  Tr. 47.  His neurologist encouraged him to leave that job because of the exposure to paint fumes.  Tr. 43-45.

Plaintiff testified that he also previously worked at All Furniture Installation moving furniture.  Tr. 48-49.  He was hired on a full-time basis but sometimes worked less when the company did not have enough work or if he called in to say he did not want to work. Tr. 48-49.  He testified that he got angry with the owner and boss of the company and "told him off one time."  Tr. 49.  Plaintiff was kept at the company after that incident but was eventually laid off after about two years of working for the company.  Tr. 49.  Plaintiff

testified that if he had not been laid off, he still probably would not have continued working there because it was "too physically demanding" and he "ma[d]e mistakes [so] it was getting too stressful." Tr. 50. Plaintiff also testified that he could not do that job today because he "was making more and more mistakes doing the job" and it took him longer to do his jobs than others. Tr. 50. Plaintiff testified that he also worked at a company called Brownsworth doing work similar to what he did at All Furniture Installation. Tr. 51. He "noticed more and more [of his] mistakes," "slowness," and forgetting how to do things he knew before. Tr. 51.

He testified that he also has prior work experience through Masterson Personnel temporary services. Tr. 51-52. He worked as a groundskeeper/janitor and would mop floors and wash windows. Tr. 52. Plaintiff testified that he would not be able to do a job like that anymore because "it was a lot of standing and movement." Tr. 52. Plaintiff said that he would often take breaks and sit down in the stairwell when he was there. Tr. 52.

He also worked at College Town Pizza in 2014 and 2015 and at Domino's Pizza in 2015. Tr. 53-54. He would generally work six or eight-hour shifts at Domino's, sometimes shorter or longer. Tr. 61. He testified that he would generally deliver pizzas to the right places, but only because he had a GPS on his phone. Tr. 56. He said that if he had to deliver pizzas to addresses based on memory, he "probably would have forgotten that address 30 seconds after leaving" the pizza store. Tr. 56. Plaintiff testified that he still made some mistakes like "grabbing the wrong pizza for the wrong place." Tr. 56. Plaintiff said he was let go from his position at Domino's because the manager was not alright with Plaintiff setting certain hours given his school schedule. Tr. 54. Plaintiff also said that he

25

was going to leave the position anyways because he did not get as many hours as he wanted. Tr. 54.  He testified that he lost his job at College Town Pizza because he lost his temper with a supervisor.  Tr. 54.  When asked by the ALJ if he could still be a pizza delivery driver, Plaintiff testified that he "wouldn't be able to do it."  Tr. 54-55.  Plaintiff suggested he could "if [he] was a healthy person" and did not have neck problems, back problems, or ADHD.  Tr. 55.  But Plaintiff said that the more he would have worked as a pizza delivery driver, the more stressed and tired he would have been.  Tr. 55.

Vocational expert Steven Bosch also testified at the hearing.  Tr. 68-78.  He testified that a hypothetical individual of Plaintiff's age, education, experience, and limitations could not perform Plaintiff's past work like pizza delivery, office furniture assembly, or construction work, but could work as an electronics worker, molding machine tender, or products assembler.  Tr. 73-75.  When Plaintiff's attorney added a limitation that the individual would have no ability or poor ability to maintain attention and concentration for extended periods, work with or near others without being distracted by them, or complete a workday at a consistent pace, Bosch testified that the person would not be able to work. Tr. 77.  When Plaintiff's attorney added an alternative limitation that the individual would have no ability or poor ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stress, maintain attention and concentration, behave in an emotionally stale manner, and relate predictably in social situations, Bosch responded that such limitations would preclude all competitive employment.  Tr. 77.

# VI. ALJ'S DECISION

The ALJ found that Plaintiff had the following severe impairments: "[c]ervical and lumbar spine degenerative disc disease; neuropathy; bilateral sensorineural hearing loss; attention deficit-hyperactivity disorder; major depressive disorder; neurocognitive disorder; and neural dysfunction/spells." Tr. 16. The ALJ further concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1. Tr. 16-18.

The ALJ found that Plaintiff had the residual functional capacity to perform light work[9] with additional limitations as follows:

> [h]e can exert 20 pounds of force occasionally and 10 pounds frequently; he can stand and/or walk about 6 hours out of 8 hours and sit about 6 hours out of 8; he can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; he can occasionally balance; he can frequently stoop, kneel, crouch, or crawl; he may not perform tasks requiring detailed hearing, but is capable of hearing and understanding speech at conversational tones; he must avoid unprotected heights and hazardous moving machinery secondary to seizure disorder; and he is precluded from commercial driving[;] [h]e may perform simple, routine, and repetitive tasks[;] [h]is interactions with others may include taking instructions, providing simple information to others, and simple coordinated tasks with others such as team lifting and transferring material.

Tr. 18.

---

[9] As set forth in the regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b); *accord* 20 C.F.R. § 416.967(b).

In reaching this residual functional capacity, the ALJ conducted an analysis of the medical opinion evidence provided in the case. *See infra* Section VII.A.1. The ALJ noted that he would "not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from your medical sources." Tr. 28. *See* 20 C.F.R. § 404.1520c ("For claims filed on or after March 27, 2017, the rules in this section apply."), .1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [Plaintiff's] medical sources."); *accord* 20 C.F.R. § 416.920c, .920c(a).

Based on Plaintiff's age, education, work experience, residual functional capacity, and the testimony of the vocational expert, the ALJ found that Plaintiff was capable of performing the representative jobs of electronics worker, molding machine tender, and product assembler. Tr. 32. Accordingly, the ALJ concluded that Plaintiff was not under disability. Tr. 31-32.

## VII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidence is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (per curium) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) [ ]he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) [ ]he could perform past relevant work; and if not, (5) whether [ ]he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

## A. Residual Functional Capacity

A claimant's "residual functional capacity is the most he can do despite his limitations." 20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, ___ F. 4th ____, 2022 WL 696974, at *5 (8th Cir. Mar. 9, 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R.

§§ 404.1546(c), 416.946(c).   "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5; *Norper*, 964 F.3d at 744-45.   As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 2022 WL 696974, at *5 (quotation omitted).   Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 2022 WL 696974, at *5; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c).

### 1. Analysis of Medical Opinions

Plaintiff argues that the ALJ failed to properly "provide analysis of medical opinions based on the set of factors enumerated" in the applicable regulations, specifically the two most important factors—supportability and consistency.   Pl.'s Mem. in Supp. at 23, 28, ECF No. 17.   Plaintiff contends that the ALJ did not analyze the medical opinions correctly under § 404.1520c and § 416.920c because "the ALJ rejected all medical opinions of [Plaintiff's] functioning, and instead substituted his own medical opinion without support from the record or any medical personnel."   Pl.'s Mem. in Supp. at 23-24.   As a result, Plaintiff argues the ALJ's residual-functional-capacity determination is not supported by

substantial evidence on the record as a whole and the conclusion that he is able to perform other work is likewise unsupported.

Plaintiff filed his applications for DIB and SSI on August 3, 2017. Tr. 13. Effective March 27, 2017, the Social Security Administration implemented new regulations related to how ALJs will consider and articulate medical opinions. *See generally* 20 C.F.R. §§ 404.1520c, 416.920c ("For claims filed . . . on or after March 27, 2017, the rules in this section apply."). Under the new rules, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *accord* 20 C.F.R. § 416.920c(a). Instead, ALJs now evaluate the "persuasiveness" of medical opinions in light of five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) examining relationship, and (5) other factors. 20 C.F.R. § 404.1520c(a); *accord* 20 C.F.R. § 416.920c(a).

The first two factors, supportability and consistency, "are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a medical source's medical opinions." 20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be. 20 C.F.R. § 404.1520c(c)(1); *accord* 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administering medical finding(s) will be. 20 C.F.R. § 404.1520c(c)(2); *accord* 20 C.F.R. § 416.920c(c)(2). Under the regulations, an ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions" in the decision. 20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2). An ALJ "may, but [is] not required to, explain how [he or she] considered the [remaining] factors." 20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2).

Plaintiff challenges the ALJ's analysis of several medical opinions provided in this case. *See* Pl.'s Mem. in Supp. at 24-30. As such, this Court addresses each opinion individually.

### a. State Agency Consultants

The ALJ found that the opinions of all the state agency consultants at the initial and reconsideration levels were "somewhat persuasive." Tr. 28. The ALJ agreed with the state agency psychological consultants' assessment that Plaintiff "retained the mental ability to perform semiskilled tasks with some relatively minor limits on social interaction." Tr. 28. Specifically, he noted that the state agency psychological consultants correctly considered Plaintiff's "generally intact daily activities and relatively unremarkable clinical findings in support of their conclusions." Tr. 28. The ALJ noted that he agreed that disabling mental limitations were not warranted. Tr. 28. The ALJ noted, however, that subsequent evidence "received at the hearing level, including the November 2017 neuropsychological evaluation and records from Nystrom, demonstrate the need for greater restrictions due primarily to ADHD-related problems such as distractibility and problems multitasking."

Tr. 28.  The ALJ added greater limitations "by limiting [Plaintiff] to simple, routine, and repetitive tasks."  Tr. 28.

Similarly, with respect to Plaintiff's physical residual functional capacity, the ALJ noted that he agreed with the state agency medical consultants' assessments that Plaintiff "retained the ability to perform medium work with several additional postural and environmental restrictions."  Tr. 28.  The medical consultants' assessment was based on "relatively benign medical findings including infrequent seizure activity, normal physical examination, intact range of motion, and normal gait."  Tr. 28.  The ALJ found that the medical consultants' findings were "generally consistent with the record and warrants consideration."  Tr. 28.  The ALJ noted again, however, that subsequent evidence received at the hearing level, such as Plaintiff having hearing loss, supported limiting Plaintiff "to light exertion and providing more restrictive postural limitations" than suggested by the state agency medical consultants.  Tr. 28.  The ALJ "emphasize[d] that these addition[al] restrictions do not preclude all competitive employment."  Tr. 28.

Plaintiff argues that the ALJ erred by finding the opinions of the state agency medical consultants that Plaintiff could perform medium level work "somewhat persuasive," yet "disregard[ing] the[ir] opinions in favor of his own medical opinion limiting [Plaintiff] to light work."  Pl.'s Mem. in Supp. at 24.  Plaintiff similarly argues that the ALJ erred by finding the opinions of the state agency psychological consultants "somewhat persuasive," yet rejecting them by imposing greater restrictions limiting Plaintiff to simple, routine, and repetitive tasks.  *Id*.  An ALJ, however, can "carefully examine[ ] the medical evidence of record in making the determination to provide greater

34

limitations than those opined by the state agency" consultants.   *See, e.g., Andrew H. S. v. Kijakazi*, No. 20-cv-1553 (SRN/HB), 2022 WL 409954, at *10 (D. Minn. Jan. 24, 2022) (finding that the ALJ did not give undue weight to the state agency consultants in finding that they underevaluated the claimant's limitations and thus incorporating greater limitations into the residual functional capacity), *report and recommendation adopted,* 2022 WL 40995 (D. Minn. Feb. 10, 2022); *Neel v. Berryhill*, No. 17-03062, 2018 WL 6072015, at *3 (W.D. Ark. Nov. 20, 2018) (finding that an ALJ's residual functional capacity determination was based on substantial evidence when the ALJ gave little weight to the residual functional capacity assessments provided by the state agency consultants because evidence received at the hearing level indicated that the claimant had greater limitations).   Thus, the ALJ did not err simply by imposing greater limitations than the state agency medical and psychological consultants provided.   Rather, he adequately supported his reasons for finding their assessments "somewhat persuasive" based on additional evidence that was received at the hearing level that supported greater restrictions, such as hearing loss, the November 2017 neuropsychological evaluation and records from Nystrom.   Tr. 28.   For example, the ALJ noted that "Barclay's [2017] evaluation report certainly supports an inclusion of a number of mental work restrictions, which have been addressed by the rang[e] of simple, routine, and repetitive tasks provided" in the ALJ's findings.   Tr. 22-23.   Similarly, the ALJ noted that records describing Plaintiff's sensorineural hearing loss in both ears support "some hearing restriction on the type of communication required in the workplace."   Tr. 26.   Accordingly, the Court finds

that the ALJ properly analyzed the supportability, consistency, and persuasiveness of the state agency consultants as a whole under 20 C.F.R. §§ 404.1520c and 416.920c.

### b.  O' Regan

Dr. O'Regan reported that Plaintiff "retained the mental ability to perform simple and complex tasks, but that his ability to sustain attention and concentration was moderately impaired, albeit not to the extent that he would not be able to carry out work-like tasks with reasonable pace and persistence."  Tr. 28.  The ALJ found Dr. O'Regan's opinions "somewhat persuasive."  Tr. 28-29.  He found Dr. O'Regan's conclusions to be "supported by his relatively benign clinical findings and observations" and "consistent with [Plaintiff's] overall objective clinical findings found throughout the record."  Tr. 28-29.  Additionally, the ALJ pointed to Plaintiff's "conservative and/or minima[l] mental health treatment history since the alleged onset date" which "lends further support to Dr. O'Regan's opinions."  Tr. 29.  Still, the ALJ found that including slightly more restrictive mental restrictions was necessary "due in part to concerns related to neural dysfunction/spells and neurocognitive disorder."  Tr. 29.  The ALJ noted that he addressed those issues by limiting Plaintiff "to simple, routine, and repetitive tasks along with providing better vocationally defined social limitations."  Tr. 29.

Like the state agency medical and psychological consultants, Plaintiff argued that the ALJ erred by finding Dr. O'Regan's evaluation consistent with the record yet rejecting the evaluation in favor of his own medical opinion.  Pl.'s Mem. in Supp. at 24.  As previously discussed, however, an ALJ does not err by simply incorporating *greater* limitations than those suggested by the doctor.  *See Andrew H. S.*, 2022 WL 409954, at

*10.  An ALJ must only explain how he "considered the supportability and consistency factors" for a medical source's medical opinion.  20 C.F.R. § 416.920c(b)(2); *see Fatuma A. v. Saul*, 2021 WL 616522, at *6 (D. Minn. Jan. 26, 2021) ("[T]he ALJ was <u>only required</u> to explain how the two most important factors, supportability and consistency, were considered.") (emphasis in original).  And again, the ALJ provided a sufficient explanation for his reliance on Dr. O'Regan's opinions.  He explained that Dr. O'Regan's conclusions were "supported" by the medical evidence and consistent with objective clinical findings found throughout the record.  Tr. 29.  He similarly explained why he still found it appropriate to provide greater limitations than those suggested by Dr. O'Regan.  Tr. 29. Thus, the ALJ did not fail to properly analyze Dr. O'Regan's medical opinions under 20 C.F.R. §§ 404.1520c and 416.920c.

### c.  Johnson[10]

The ALJ found Dr. Johnson's opinions to be "not persuasive."  Tr. 29.  First, the ALJ was not persuaded by Dr. Johnson's opinion that Plaintiff would be unable to perform any employment due to his history of macrocephaly, developmental delay, and learning disabilities.  Tr. 29.  The ALJ discounted her opinion because she "failed to provide any functional analysis of retained ability or refer to objective findings in support of her conclusory statement that [Plaintiff] is unemployable."  Tr. 29.  Specifically, the ALJ noted that Dr. Johnson "fail[ed] to address [Plaintiff's] work history, which clearly demonstrates

---

[10] Plaintiff does not specifically challenge the ALJ's analysis of Dr. Johnson's medical opinions.  Nonetheless, because Plaintiff argues that the ALJ rejected "all medical opinions of [Plaintiff's] functioning" and that the ALJ's residual functional capacity assessment was not supported by the record, Pl.'s Mem. in Supp. at 22-24, the Court will address the ALJ's analysis of Dr. Johnson's opinions.

that the majority of the conditions referenced in this assessment, such as a history of macrocephaly, learning disabilities, and memory problems, did not prevent [Plaintiff] from engaging in substantial gainful activity in the past." Tr. 29.  Additionally, the ALJ was not persuaded by Dr. Johnson's physical medical source statement where she wrote that Plaintiff's cognitive deficits "may reduce his ability to work" because Dr. Johnson "did not provide any functional analysis" and her "statement essentially provide[d] no opinion." Tr. 29.

The Court finds that the ALJ properly analyzed the supportability and consistency of Dr. Johnson's opinions.  The Court notes that Dr. Johnson's opinions on Plaintiff's limitations were provided on "check the box" forms.  *See* Tr. 581-85.  An ALJ can give limited weight to a physician's opinion when that physician's check-the-box form contains only conclusory statements and no supporting analysis or explanation.  *See Grindley v. Kijakazi*, 9 F.4th 622, 632 (8th Cir. 2021); *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (finding it proper for an ALJ to give little weight to a doctor's opinion when it indicated that the claimant could not work but gave no explanation and proffered no evidence for the conclusion).

Moreover, in finding Dr. Johnson's opinions not persuasive, the ALJ observed that Dr. Johnson "fail[ed] to address [Plaintiff's] work history, which clearly demonstrates that the majority of the conditions referenced in this assessment, such as a history of macrocephaly, learning disabilities, and memory problems, did not prevent [Plaintiff] from engaging in substantial gainful activity in the past."  Tr. 29.  In other words, the ALJ discounted Dr. Johnson's opinions because they were inconsistent with other substantial

evidence in the record. *See* 20 C.F.R. §§ 404.1520c(a), (c)(2), 416.920c(a), (c)(2). When a medical opinion contains greater limitations than the claimant "actually exhibits in her daily living, an ALJ need not ignore the inconsistency." *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012); *see also, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017). As stated above, consistency with other evidence in the record is one of the most important factors in determining the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2); *see also Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007).

Here, the ALJ observed that Dr. Johnson's opinion that Plaintiff would be unable to perform any employment due to his history of macrocephaly, developmental delay, and learning disabilities was inconsistent with his ability to engage in substantial gainful activity in the past while dealing with these same issues. Tr. 29. Multiple doctors opined that Plaintiff's conditions were lifelong. *See, e.g.,* Tr. 420 (Dr. Peterson noting that doctors were assessing "whether or not what [Plaintiff] is experiencing is an extension of his lifelong memory and learning difficulties"); Tr. 449 (Barclay describing Plaintiff as having "long-standing developmental delays, learning disabilities, and attention deficit disorder"). Yet, as the ALJ noted, Plaintiff's lifelong conditions did not previously prevent him from working. As Plaintiff testified, he worked for National Coating Supply for two years where his responsibilities included collecting items from a warehouse, loading them into a truck, and delivering them. Tr. 43, 46-47. He only left that job because his neurologist encouraged him to do so given the exposure to paint fumes. Tr. 43-45. Plaintiff testified that he also worked full time at All Furniture Installation and did similar work at

Brownsworth moving office furniture.  Tr. 48-51.  He worked for All Furniture Installation for two years and only left that job because he was laid off at the same time as multiple other people were.  Tr. 49.  He also worked as a groundskeeper/janitor and pizza delivery driver for two different pizza places.  Tr. 52-54.  Thus, the Court finds that the ALJ did not err in finding Dr. Johnson's opinions unpersuasive, particularly in light of the other evidence in the record showing that Plaintiff previously engaged in substantial gainful activity while dealing with his conditions such as developmental delays and learning disabilities.  *See Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005) (claimant's ability to work with his impairments in the past, coupled with no indication of a deterioration in his condition, suggest that these impairments are not presently disabling).

### d.  Barclay

The ALJ likewise found Barclay's opinions that Plaintiff's limitations "effectively precludes all competitive employment" to be "not persuasive."  Tr. 30.  The ALJ noted that Barclay relied on her 2014 and 2017 neuropsychological evaluations to explain that Plaintiff has a wide range of deficits that would effectively preclude any competitive employment, including "a very high rate of absenteeism" and "work-related mental abilities suggestive of very serious deficits in virtually all work areas."  Tr. 30.

The ALJ explained that, while he certainly acknowledged that Barclay's 2014 and 2017 evaluations were significant and demonstrated the need of long-term mental limitations, "the degree of dysfunction suggested by Barclay's January 2018 assessment appears to overstate the extent of [Plaintiff's] difficulties, especially given the rather routine nature of long-term mental health treatment, the lack of significant clinical findings

from a variety of mental sources, and even the generally mild to moderate deficits described in the 2014 and 2017 evaluation reports." Tr. 30. The ALJ specifically pointed to Barclay's 2017 evaluation where she did not "express significant misgivings regarding expected rate of absenteeism." Tr. 30. Additionally, the ALJ noted that the 2017 evaluation report showed that Plaintiff's most significant concerns dealt with attention, concentration, and memory, which the ALJ addressed by limiting Plaintiff to simple, routine, and repetitive tasks. Tr. 30. As such, the ALJ did not find Barclay's opinions persuasive because he found them unsupported by the medical evidence of record.

Plaintiff argues that the medical evidence in the record does support Barclay's opinions, and therefore the ALJ erred by finding them unpersuasive. Tr. 25-27. However, upon review of the record, the Court finds that the ALJ properly considered the supportability and consistency of Dr. Johnson's opinions in finding them unpersuasive. Again, under the new regulations, the ALJ does not need to give controlling weight to a treating physician's opinion. *Compare* 20 C.F.R, §§ 416.920c (explaining that no controlling weight is given to any medical opinions under the new regulations), *and* 20 C.F.R. § 404.1527(c)(2) (giving controlling weight to a treating source's medical opinion in certain situations). Even before § 404.1520c and § 416.920c did away with deferring and giving specific evidentiary weight, including controlling weight, to treating physicians, an ALJ was permitted to "discount a treating source opinion that is unsupported by treatment notes." *See Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016); *Anderson*, 696 F.3d at 794 (no error in "minimal weight" assigned to treating neurologist's opinion where "the significant limitations [neurologist] expressed in his evaluation are not reflected

in any treatment notes or medical records"); *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." (quotation omitted)). Here, the ALJ cited evidence from Barclay's evaluations that does not support her opined limitations. Specifically, Barclay opined that Plaintiff would have "a very high rate of absenteeism." Tr. 30, 598. But she did not express any misgivings about Plaintiff's expected rate of absenteeism in her 2017 report. Tr. 30; *see also* Tr. 706-13. While Barclay did note that Plaintiff's mild to moderate cognitive deficits would be expected to interfere with his ability to sustain competitive employment in most scenarios, she opined that Plaintiff would need a fair amount of repetition and hands-on experience in order to learn and encode new processes or procedures, though there could still be a high risk of error. Tr. 709.

Significantly, in Barclay's 2017 evaluation, she concluded that when comparing the first neuropsychological test results from April 2014 to the new test results, "there is no evidence whatsoever of any worsening of [Plaintiff's] neurocognitive status." Tr. 707-08. In fact, Barclay noted that Plaintiff's "[s]pontaneous recall functions are possibly slightly/minimally improved versus stable compared to his last exam," and "[a]ll other neurocognitive domains have remained static over this time period as well." Tr. 708. Yet, as the ALJ points out, Barclay failed to take into account that Plaintiff was working at the time of his 2014 evaluation. *See* Tr. 452 (Plaintiff "has worked in furniture inst[a]llation and data entry for a temp agency in the past and is currently employed as a delivery person for [D]omino[']s pizza. When he started the job in August 2013, he was working 3 days a

week but now he is only offered hours one day a week following new management.  The patient stated 'when I ask for more work, a response is that new people are getting the hours.'  He is looking for other jobs at this point.").  In her 2014 evaluation, Barclay recommended that Plaintiff complete vocational rehabilitation as she believed it "could really be of benefit both in terms of helping him to select an appropriate job type and giving him some practical tools to improve his efficiency and competency at work."  Tr. 450.  Barclay noted that Plaintiff has a history of developmental delays and long-standing learning disability and attention deficit disorder and his memory problems likely recently came to his attention again because he was taking college classes in welding and struggling academically.  Tr. 450.  Barclay did not state that Plaintiff's issues were brought to his attention from any of his previous or current jobs.  Instead, she just recommended that Plaintiff get more sleep and exercise, work on compensatory strategies to improve attention and memory, and complete home-based cognitive rehabilitation.  Tr. 450.  Thus, it was proper for the ALJ to find Barclay's opinion unpersuasive when her opinion that Plaintiff's limitations effectively preclude all competitive employment was inconsistent with Plaintiff's employment as a pizza delivery driver at the time of the 2014 evaluation she based her opinion on and her finding that there had been no worsening of Plaintiff's cognitive status between 2014 and 2017.  *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(2), 416.920c(b)(2), (c)(2); *see also Halverson*, 600 F.3d at 929-30.  The Court finds that the ALJ properly analyzed the supportability and consistency of Barclay's opinions as a whole and provided good reasons for finding Barclay's opinions unpersuasive.

### e. Sabharwal

The ALJ also found Dr. Sabharwal's opinions that arguably support total work preclusion to be "not persuasive." Tr. 30-31. The ALJ stated that Dr. Sabharwal "noted developmental delays, learning disabilities, and mild to moderate execute dysfunction," but "[h]e did not refer to any significant objective findings or observations in support of his assessment." Tr. 30. The ALJ stated that records "fail to describe the level of dysfunction suggested by [Dr. Sabharwal's] assessment." Tr. 31.

Plaintiff contends that the ALJ failed to properly analyze the supportability and consistency of Dr. Sabharwal's opinions. Pl.'s Mem. in Supp. at 28. The Court, however, finds that he did. In rejecting Dr. Sabharwal's opinions, the ALJ discussed that, like Dr. Johnson, Dr. Sabharwal attempted to rely on Plaintiff's lifelong conditions yet failed "to address [Plaintiff's] work history that shows that these conditions have in the past not prevented [Plaintiff] from working." Tr. 30-31; *see Goff*, 421 F.3d at 792-93. The ALJ also pointed to inconsistencies between Dr. Sabharwal's opinions that support total work preclusion and his own treatment notes. Tr. 31. For example, in early April 2019, Dr. Sabharwal described an examination with Plaintiff that was "unremarkable." Tr. 31. Dr. Sabharwal's treatment notes classifying Plaintiff as a "pleasant male in no apparent distress," "alert [and] oriented to person, place[,] and time," with a "stable" memory. Tr. 690-93. *See* 20 C.F. R. §§ 404.1520c, 416.920c; *see also Martise*, 641 F.3d at 925 ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." (quotation omitted)). Further, the ALJ pointed out that "objective evidence . . . , including EEG studies, did not

44

demonstrate substantial abnormalities consistent with the level of dysfunction suggested by [Dr. Sabharwal's] assessment." Tr. 31. While a July 2017 EEG was abnormal, the ambulatory EEG study conducted the following month was unremarkable with no abnormal events. Tr. 21, 573-74. Dr. Sabharwal's records also document that Plaintiff's September 2018 EEG was normal. Tr. 21, 676-77, 732. The ALJ discounted Dr. Sabharwal's opinions in part due to these inconsistencies. *See* 20 C.F. R. §§ 404.1520c, 416.920c; *see also Halverson*, 600 F.3d at 929-30. Thus, this Court finds that the ALJ properly evaluated Dr. Sabharwal's opinions in compliance with the new regulations.

### f. Anderson

Lastly, the ALJ also found Dr. Anderson's opinions "not persuasive." Tr. 29-30. The ALJ first addressed Dr. Anderson's physical medical source statement from November 2017, where he "opined that [Plaintiff] retained the ability to perform only a reduced rang[e] of sedentary work." Tr. 29. Based on Dr. Anderson's recommendations that Plaintiff would have a very high rate of absenteeism and percentage of the day off task, Plaintiff would effectively be precluded from all competitive employment. Tr. 29. The ALJ noted that "treatment records from Dr. Anderson and other medical/mental health sources simply do not support this degree of restrictions." Tr. 29. The ALJ used as an example Dr. Anderson's conservative care geared to improving deconditioning (as opposed to addressing severe pathology) shows the inconsistencies between his assessment and the Plaintiff's medical treatment history. Tr. 29. Thus, the ALJ found Dr. Anderson's November 2017 medical source statement "not persuasive." Tr. 29.

The ALJ similarly discounted Dr. Anderson's June 2019 medical assessment, where he "described a much-reduced range of sedentary work inconsistent with competitive employment." Tr. 30. The ALJ pointed to the inconsistencies between Dr. Anderson's assessment and "his own contemporaneous records, which described few positive findings and generally unremarkable complaints." Tr. 30. The ALJ also noted that in June 2019, Plaintiff was only seeing Dr. Anderson for "primary care" and was instead seeing Dr. Kimmerle for his pain. Tr. 30.

Plaintiff argues that the ALJ failed to give proper analysis to Dr. Anderson's opinions because the record contains findings supportive of significant non-conservative care. Pl.'s Mem. in Supp. at 25. For example, Plaintiff discusses MRI findings of degenerative changes in his lumbar spine and treatment including injections and a TENS unit. *Id*. The Court, however, finds that the ALJ did not err in finding Dr. Anderson's opinions unpersuasive, particularly in light of the other evidence in the record referenced by the ALJ showing that Plaintiff had intact strength (Tr. 19-20, 532, 538, 545, 632, 639, 651, 682, 692); no gait abnormalities (Tr. 19-26, 532, 616, 632, 686, 670, 673, 712); and generally intact range of motion (Tr. 25-26, 538, 621, 686, 670, 673). *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(1),(2), 416.920c(b)(2), (c)(1),(2); *see also Anderson*, 696 F.3d at 794; *Martise*, 641 F.3d at 925; *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). Moreover, the conservative treatment and the lack of any surgical intervention supports the ALJ's residual functional capacity determination. *See Buford v. Colvin*, 824 F.3d 793, 796-97 (8th Cir. 2016); *Michlitsch v. Berryhill*, No. 17-cv-3470 (MJD/TNL), 2018 WL 3150267, at *16 (D. Minn. June 12, 2018), *report and recommendation adopted by* 2018

WL 3150225 (D. Minn. June 27, 2018) (injections considered conservative treatment); *McNelis v. Astrue*, No. 11-cv-16 (SRN/LIB), 2012 WL 838408, at *3 (D. Minn. Feb. 3, 2012), *report and recommendation adopted by* 2012 WL 837116 (D. Minn. Mar. 12, 2012) (TENS unit considered conservative treatment). In sum, the Court finds that the ALJ gave proper weight to all of the medical opinions.

### 2. Analysis of Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ erred in his evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms. Pl.'s Mem. in Supp. at 30-34. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 26.

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical

> sources and other persons; and any other relevant evidence in the
> individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  Such evaluation includes consideration of "(i) the

claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain;

(iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects

of medication; and (v) the claimant's functional restrictions."  *Vance v. Berryhill*, 860 F.3d

1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p,

2016 WL 1119029, at *7.

"Credibility determinations are the province of the ALJ, and as long as good reasons

and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to

[the ALJ's] decision."  *Julin*, 826 F.3d at 1086 (quotation omitted); *see Hensley v. Colvin*,

829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long

as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing

so." (quotation omitted)).

Plaintiff asserts that the ALJ erred by improperly evaluating the intensity,

persistence, and limiting effects of Plaintiff's symptoms.  In evaluating the intensity,

persistence, and limiting effects of Plaintiff's symptoms, the ALJ heavily focused on the

objective medical evidence.  *See* Tr. 26-28.  The ALJ described the results of imaging and

other testing completed by Plaintiff's treatment providers and how those results compared

to his subjective complaints.  The ALJ noted instances in which the objective medical

evidence tended to support Plaintiff's subjective complaints, including, for example, where

the record "contain[s] diagnostic imaging showing pathology capable of producing a

degree of pain" and "consistently refer[s] to neurocognitive and ADHD-related concerns manifested by deficits in memory, distractibility, and deficits in attention/concentration." Tr. 27.

At the same time, the ALJ correctly pointed out that there was objective medical evidence in the record that did not substantiate the intensity, persistence, and limiting effects of Plaintiff's symptoms to the degree alleged. The ALJ cited objective medical evidence in the form of "underwhelming findings" showing, for example, "normal imaging [and] unremarkable EEG studies." Tr. 27. The ALJ noted that no "treating medical sources [have] referred to positive physical findings consistent with the level of dysfunction alleged at the hearing." Tr. 27. Similarly, "clinical findings from various medical and mental health professionals have routinely observed that [Plaintiff] was cooperative, pleasant and displayed no substantial signs of anxiety, psychosis, or depression." Tr. 27. Moreover, the ALJ discussed that Plaintiff's medical treatment has not been consistent with a disabling physical or mental condition. Tr. 27. Thus, the ALJ conducted a proper assessment of Plaintiff's symptoms as his assessment was supported by substantial evidence.

In addition to the objective medical evidence that supports the ALJ's decision to discount Plaintiff's claims of disabling pain, the Court finds that the ALJ also properly considered the appropriate factors based on evidence in the record as a whole in discounting Plaintiff's subjective symptoms. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2016 WL 1119029, at *4 ("We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record."). In making his

determination, it appears the ALJ carefully considered: (i) Plaintiff's daily activities, (ii) the duration, frequency, and intensity of Plaintiff's pain, (iii) precipitating and aggravating factors, (iv) the dosage, effectiveness, and side effects of medication, and (v) Plaintiff's functional restrictions. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *7; *see also Vance*, 860 F.3d at 1120.  For example, the ALJ reasonably found Plaintiff's reported daily activities somewhat inconsistent with his complaints of disabling pain and mental impairments.  Tr. 26.  He reported that "he is able to care for his own personal hygiene."  Tr. 22.  He reported doing chores such as laundry and cooking. Tr. 22.  He reported spending most of his days watching television or using social media, though occasionally socializing with a number of friends.  Tr. 22.  He also reported renting the lower level of his mother's house, and being "self-contained."  Tr. 22.  Plaintiff also continued to drive despite his claims of severe inattention, anxiety, and poor focus.  Tr. 22, 26.  While a claimant "need not prove she is bedridden or completely helpless to be found disabled," *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted), Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of disabling pain and may be considered alongside other factors in assessing the severity of his subjective complaints of pain.  *See Vance*, 860 F.3d at 1121 (finding "[t]he inconsistency between [the claimant's] subjective complaints and evidence regarding her activities of daily living" raised questions about the weight to give to her subjective complaints).  Thus, the ALJ properly discredited Plaintiff's allegations of pain and impairments as they were inconsistent with evidence of daily activities.  *See, e.g., Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking,

vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). The ALJ also properly factored in the medications Plaintiff was prescribed and noted that Plaintiff was not prescribed narcotic pain medication. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (stating that the lack of strong pain medication is inconsistent with subjective complaints of disabling pain).

Plaintiff additionally asserts that the ALJ improperly discounted the severity of pain by finding that his care was conservative because he has not needed surgery, gone to the emergency room, or been hospitalized. Pl.'s Mem. in Supp. at 32-33. As previously discussed, however, the treatment Plaintiff received for his back and neck pain are considered conservative. *See Buford*, 824 F.3d at 796-97; *Michlitsch*, 2018 WL 3150267, at *16 (injections considered conservative treatment); *McNelis*, 2012 WL 838408, at *3 (TENS unit considered conservative treatment). Moreover, Plaintiff received conservative treatment for his mental impairments as well. *See, e.g., Englerth v. Colvin*, No. 1:15-cv-82-ncc, 2016 WL 5470170, at *6 (E.D. Mo. Sept. 29, 2016) (lack of inpatient psychiatric treatment, emergency mental health treatment considered conservative treatment). Likewise, it was proper for the ALJ to consider that Plaintiff reported some symptom improvement from his prescribed medication. *See Hensley*, 829 F.3d at 933-34 (if an impairment can be controlled by treatment or medication, it cannot be considered disabling). Moreover, Plaintiff reported some improvement in pain with physical therapy and explained that prescribed medication was beneficial. Tr. 25.

In sum, the ALJ provided good reasons to support the conclusion that Plaintiff's symptoms were not as intense, persistent, and limiting as alleged.  Therefore, the Court concludes that the ALJ did not err in assessing the intensity, persistence, and limiting effects of Plaintiff's subjective complaints.

### B.  Finding that Plaintiff Can Perform Work

Lastly, Plaintiff asserts that the ALJ incorrectly found that Plaintiff can perform other work at step 5 of the residual functional capacity determination.  Plaintiff argues that the ALJ's residual functional capacity finding and subsequent hypothetical questions to the vocational expert "did not reflect [Plaintiff's] limitations based upon multiple evaluations." Pl.'s Mem. in Supp. at 35.

At step five of the residual functional capacity determination, "the burden of production shifts to the Commissioner to produce evidence of jobs available in the national economy that can be performed by a person with the claimant's [residual functional capacity] and vocational skills."  *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  The ALJ satisfies that burden by providing a vocational expert who testifies as to the availability of jobs in the national economy for persons in a similar position to the claimant. *Id.*; *see also Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff's argument is based on his contention that the ALJ erred by not including all of the limitations opined by Plaintiff's doctors in his residual functional capacity.  As discussed above, however, the Court has concluded that the ALJ's analysis of the medical opinions is supported by substantial evidence in the record as a whole.  "An ALJ must include 'only those impairments and limitations he found to be supported by the evidence

as a whole in h[er] hypothetical to the vocational expert.'" *Nash v. Commissioner, Social Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011)).   An ALJ is "not required to include other limitations in the hypothetical that he found to be unsupported in the record." *Perkins*, 648 F.3d at 902. Because the ALJ found the marked and extreme limitations opined by Barclay and the other doctors were not supported by the record as a whole, he was not required to include them in the hypothetical posed to the vocational expert.

## VIII. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment, ECF No. 16, is **DENIED.**

2.  The Commissioner's Motion for Summary Judgment, ECF No. 19, is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March ___31___, 2022                              _____*s/Tony N. Leung*_____
                                                         Tony N. Leung
                                                         United States Magistrate Judge
                                                         District of Minnesota


                                                         *David A. P. v. Kijakazi*
                                                         Case No. 20-cv-1586 (TNL)